RENDERED: APRIL 17, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-0376-ME

DANIEL WOODIE                                               APPELLANT

v.
APPEAL FROM KENTON FAMILY COURT
HONORABLE THOMAS A. RAUF, JUDGE
ACTION NO. 24-D-00395-001

MADISON RENEE HULL                                         APPELLEE

AND

NO. 2025-CA-1049-ME

DANIEL WOODIE                                               APPELLANT

v.
APPEAL FROM KENTON FAMILY COURT
HONORABLE THOMAS A. RAUF, JUDGE
ACTION NO. 24-D-00395-001

MADISON RENEE HULL                                         APPELLEE

<u>OPINION</u>
<u>AFFIRMING</u>

** ** ** ** **

BEFORE:  CALDWELL, CETRULO, AND EASTON, JUDGES.

CETRULO, JUDGE:  In this consolidated appeal, Appellant Daniel Woodie ("Woodie") appeals an Interpersonal Protection Order ("IPO") entered against him in November 2024 by the Kenton Family Court and a subsequent order entered in July 2025 denying Woodie's CR[1] 60.02 motion to vacate the IPO.  We conclude there was substantial evidence to support the family court's finding that his behavior amounted to an implicit threat, and that his actions reasonably placed the victim in fear of physical injury.  Additionally, we find no abuse of discretion in the family court's denial of Woodie's CR 60.02 motion.  Accordingly, we affirm both orders of the Kenton Family Court.

## BACKGROUND

In September 2024, Madison Renee Hull ("Hull") petitioned for an IPO against Woodie.  Based on the allegations in the petition, the Kenton Family Court granted a temporary IPO.  Following multiple continuances, the family court conducted an extensive hearing spanning over the course of two days on

---

[1] Kentucky Rule of Civil Procedure.

November 15 and 18, 2024, and heard testimony from Hull, her "Stepfather" and "Mother," and Woodie.

The parties agree that Woodie, a 43-year-old man and government contractor,[2] was a friend of Stepfather. However, Woodie gradually befriended his friend's stepdaughter, Hull, a 23-year-old female. At the beginning of his friendship with Hull, Woodie would help her with small things like offering rides or buying her a meal, but that "friendship" did not continue in a healthy, supportive manner.

During the hearing, Hull and her parents admitted Woodie gave Hull financial support and helped Stepfather around the house, but asserted Woodie's friendship morphed into a controlling infatuation with Hull and unrelenting perseverance and surveillance. They asserted they began to fear for Hull's safety and asked Woodie to stop pursuing Hull. Despite their requests, Woodie persisted.

Conversely, Woodie argued he only gave Hull financial support and friendship. He admitted he had professed his love for Hull in the past, but stated he never threatened Hull. Woodie testified that his main concern was with Hull's

---

[2] The record is imprecise as to Woodie's employment. During a prior hearing, Woodie's legal counsel implied Woodie was a federal agent with a need to carry a firearm. At the November Hearing, Hull testified that she did not know what Woodie did for a living; Woodie testified Hull knew what kind of work he did as he had told her "several times" that he worked for Homeland Security, specifically Customs and Border Patrol. Woodie testified he was a member of a local county FOP (fraternal order of police); however, he also testified that he was a radio frequency engineer with a high school education who worked for IT Tech Direct, an Information Technology ("IT") company that contracts with the United States Department of Homeland Security.

drug use and his actions were an attempt to help protect her from negative influences (such as her boyfriend). Woodie testified that only recently Hull had asked him to leave her alone in writing, and he had respected her wishes.

After more than eight hours of testimony, the family court granted Hull's petition for an IPO. At the conclusion of the hearing, on November 18, the court made oral findings and conclusions ("November Hearing"), and subsequently entered written findings of fact and conclusions of law on December 24 ("December Order"). As will be discussed in more detail below, we are mainly reviewing the sufficiency of the family court's findings and conclusions. As such, our recitation of the facts shall focus on the family court's oral and written determinations.

In orally granting the IPO at the November Hearing, the family court found (1) Hull was harassed by Woodie more than two times after she asked him to leave her alone; (2) a reasonable person would have had cause to fear for her safety and suffered substantial mental distress due to Woodie's actions; and (3) Woodie's actions, calls, and messages created an implicit threat of physical harm to Hull. The family court described Woodie's behavior as out of the ordinary, concerning,

and disturbing. The family court ordered Woodie to surrender his firearms[3] and to stay at least 500 feet from Hull for a three-year duration.

In its written December Order, the family court further elaborated upon its factual findings and legal conclusions orally issued at the November Hearing. The court stated the protective order was

> substantially based on a determination that on or around September 2024 [Woodie] continued to contact harass and intimidate [Hull] on multiple occasions after [Hull] in no uncertain terms told [Woodie] that she [] did not want to have contact with [him]. The contact included communication wherein [Woodie] persisted in bypassing [Hull's] efforts to block [Woodie] and culminated in two confrontations at the residence of [Hull] in a manner which are construed by the Court as an implicit threat by [Woodie], and reasonably placed [Hull] in fear for physical injury or sexual contact.

The family court noted that while those two confrontations were the culmination of Woodie's conduct, the "history of interaction between [Woodie] and [Hull] show a pattern of behavior which the Court finds significantly concerning and informative in determining that [Woodie] persisted in stalking [Hull]." While we do

---

[3] Woodie's legal gun ownership is well established in the record and is not being contested. Hull testified that she knew of Woodie's gun ownership and had even discussed with him the possibility of purchasing a gun for herself. Stepfather also testified that he and Woodie often went to the gun range together. After the family court issued the IPO, the court asked Woodie how many firearms he owned. He appeared reluctant to answer and finally stated he owned "probably 10." A subsequent registry review included in the record on appeal listed at least 28 firearms purchased and registered by Woodie since August 2021.

not believe it necessary to repeat the family court's entire 16-page order, we shall relay the findings and conclusions that exemplify the extent of the court's concerns.

The family court stated all four witnesses consistently testified that Woodie frequently visited Hull's parents' home (where Hull lived after she lost her apartment) and offered his unsolicited "help" around their house. The court also acknowledged Woodie's history of paying for Hull's expenses, including rent, furniture, groceries, and utilities, and providing her with a vehicle and credit card.

The court referenced the many notes Woodie sent Hull professing his love for her, including messages such as he would "never love anyone the way I love you." The court also stated that there was "no indication that this type of affection was reciprocated by [Hull]." The court repeated Mother's testimony that when Woodie was around, he only spoke of Hull, even after Mother asked him to stop. Mother also asked Woodie to stop contacting her daughter, and the family court repeated Mother's concern about Woodie's "obsessive behavior."

The court found that in August 2024, Hull asked Woodie for money, then asked him not to contact her again, then blocked him from sending text messages.[4] The court noted that after being blocked on texting, Woodie sent small

---

[4] The family court held that, according to the testimony, Hull continued to re-initiate some contact from time to time after cutting off contact. The court stated Hull rationalized that she might as well get something if she was going to endure Woodie's unwanted harassing communication and contact. "While the [family court] would have preferred a strict no contact by [Hull], the pattern of engagement and re-engagement with perpetrators of domestic violence

amounts of cash and messages through the CashApp to Hull in order to maintain communication. The court rejected Woodie's contention that by accepting the cash, Hull reopened communication. Hull's last communication to Woodie occurred on CashApp on September 11 where she asked Woodie in writing to stop contacting her. Woodie then sent another message professing his love and saying "goodbye" unless she changed her mind.

The family court recognized Woodie's testimony that he was concerned about Hull's drug use to the extent that he filled out a Casey's Law petition,[5] but Hull testified that she did not use drugs. Hull testified that she would see Woodie in the vicinity, then soon after she would get stopped by police. Hull believed Woodie was calling in false police reports to harass and intimidate her. The court stated it "found [Hull's] testimony regarding these police stops as credible."

The court also noted Woodie admitted to making a flyer about Hull and her alleged drug use and/or drug connections. The court repeated Woodie's contention that the flyer was intended to make Hull's "life better, not to harm." However, the flyer contained Hull's photo and inferred she was a drug user with

_____

is not uncommon. The cycle of abuse is well know[n] to this Court. Survivors regularly return to the abuse for a variety of reasons, including for financial support that is created by the perpetrator of domestic violence who has trapped them in the cycle."

[5] *Casey's Law*, Kentucky Revised Statute ("KRS") 222.432, allows the spouse, parents, relatives, guardian, or friends of a person with substance abuse disorder to request involuntary, court-ordered addiction treatment.

mental health issues. The flyer requested concerned citizens contact Woodie and included his phone number.

The court recounted Hull's testimony that she was concerned for her safety and felt uncomfortable and afraid when Woodie professed his love for her. The court noted Hull's testimony that while Woodie lived in Cincinnati, Ohio, she had unexpected encounters with him on several occasions in Northern Kentucky, including one at her local Walmart and another outside her place of employment. Woodie testified it was coincidence that he saw her while at her work as he was in the area for other purposes, yet the timing was strangely perfect as he again had presents to give her. The court stated Woodie admitted to waiting on the street by Hull's boyfriend's apartment "for the purpose of discouraging her from having a relationship with him." Yet, the court considered this "harassing without a legitimate purpose."

Additionally, the family court discussed the culminating events in September 2024 when Woodie came to Hull's family home after she blocked his text messages and told him "in no uncertain terms that she did not want to communicate with him, that she did not feel comfortable around him and that he was to stop any additional contact."

First, the family court stated Woodie came to Hull's family home at quarter to midnight, unannounced, and acting erratically and "harassing." The

court noted that Woodie "did not think it was odd" that he appeared unannounced near midnight in an attempt to reopen communication with Hull. That night, Stepfather repeatedly asked Woodie to leave, would not let Woodie speak to Hull, and again asked Woodie to cease contacting Hull.

Only days later, another incident occurred when Woodie returned to Hull's family home and attempted to remove the license plate off a vehicle parked in the driveway that was Hull's current vehicle (not the one Woodie had "leased" her previously). Woodie testified that a familial relation, who owned the car, instructed him to do so, but those facts were not verified at the hearing. The court determined that whether or not the owner had sent him, Woodie had no reason to enter the private property of Hull's family home other than to again "harass and intimidate [Hull]."

The family court stated it was "clear" that Woodie actively worked to create Hull's reliance on him, and his behavior is "consistent with grooming and coercive control[.]" The court found Hull to be "highly credible" when speaking about the fear she had concerning Woodie in light of the police reports and Woodie's seemingly constant presence around Northern Kentucky, an area in which he did not live or work. The court referenced Hull's testimony that due to the anxiety created by Woodie's stalking, she had lost her job, some friends, and her sense of safety.

Similar to the factual findings, the family court, in its December Order, made thorough conclusions of law. Most relevantly, the family court concluded Woodie engaged in a pattern of stalking Hull, and she was in reasonable fear of sexual contact, physical injury, or death from Woodie's stalking. Further, Woodie intentionally engaged in at least four instances directed at Hull that seriously alarmed, annoyed, intimidated, and harassed her (arriving at her work, calling the police, appearing at the family home near midnight, and attempting to remove the license plate from the car she was driving). The court noted these instances were in addition to the frequent messages, cards, gifts, and other numerous incidents where Hull believed Woodie was calling the police to get her pulled over for a traffic stop. The court stated, "[a]ltogether, these acts seriously intimidated and harassed her." The court found Woodie's actions "served no other purpose but to repeatedly, implicitly, threaten [Hull]." The family court did not find Woodie's testimony credible, *i.e.*, that he was doing these acts because of his concern for Hull and to deter her from her alleged drug use. The court stated its belief that Woodie perceived himself to be an authority figure in Hull's life and "if [Hull] were to act in a way unaligned with what he believe[d], he would take swift action into making sure [Hull] did what he wanted."

The family court did not doubt that Woodie's conduct "could, and would, occur again, as [Woodie] testified that his actions were reasonable and he

-10-

did not listen when told to stay away." The court found Woodie's use of law enforcement to harass Hull as "truly heinous, as it creates distrust in a system and individuals whose role is intended for protection." The family court concluded Woodie's actions – (1) unannounced appearance at Hull's family home, (2) frequent use and threat of police interference, and (3) the use of coercive economic control over Hull – "were clear implicit threats that put [Hull] in reasonable fear of sexual contact, physical injury, or death." The family court correlated the present matter to *Allen v. Eder*, 682 S.W.3d. 32 (Ky. App. 2023), to be discussed with more detail in our analysis. The family court stated Woodie's conduct escalated and invaded Hull's privacy "with the implicit understanding that [Woodie] believe[d] he can and will continue to be around [Hull], whether she likes it or not." Ultimately, the family court concluded, "While [Woodie] focused significant testimony on attacking the credibility, motivation, and background of [Hull], the Court is not distracted by these attempts to obfuscate the behavior and actions of [Woodie] much of it he admits which necessitate entry of the [IPO]." Ultimately, the family court granted an IPO against Woodie and ordered him to surrender his firearms. The IPO included "[n]o third party contact."

Woodie filed a CR 59.05 motion to vacate the IPO – mainly challenging the family court's reliance on *Allen* and the veracity of the testimony by Hull and her witnesses. In response (and joined with a motion for contempt),

Hull stated Woodie, in violation of the IPO, reached out to Stepfather stating Woodie wanted to "get past this and work to repair things very soon." According to Stepfather, after he told Woodie to cease contact, Woodie called his employer in an attempt to get him fired from his place of employment.

The family court denied Woodie's CR 59.05 motion (mainly because *Allen* is binding precedent with relevant facts) and Hull's motion for contempt (because Stepfather is not a protected party under the IPO). Woodie timely appealed the IPO. That appeal is one of the two consolidated before us.

In June 2025, Woodie filed a motion for relief from judgment pursuant to CR 60.02(b) and (c). Specifically, Woodie stated that the extraordinary relief of vacating the IPO was appropriate due to (1) newly discovered evidence, and (2) proof Hull and her witnesses committed perjury. The family court determined Woodie did not establish cause for such extraordinary relief and denied the motion. Woodie appealed. That denial is the second order consolidated within this appeal.

Additional facts will be added where relevant.

## ANALYSIS

Here, the family court found every necessary element for issuing an IPO and diligently recorded its findings and conclusions. On appeal, Woodie does not contest the court's finding of harassment, but Woodie does argue the family

-12-

court (1) misinterpreted KRS 508.150 as he never made any threat, explicit or otherwise, that would justify the issuance of a protective order, and (2) erred in denying his CR 60.02 motion.

### A. IPO: No Reversible Error

Following an evidentiary hearing, the family court must make the necessary findings of fact. CR 52.01. We review the family court's factual findings for clear error and its decision to enter an IPO for abuse of discretion. *See Gomez v. Gomez*, 254 S.W.3d 838, 842 (Ky. App. 2008) (Domestic Violence Order ("DVO") appeal); *see also Smith v. Doe*, 627 S.W.3d 903, 908 (Ky. 2021) (noting statutes governing IPO and DVO proceedings are interpreted similarly).

Questions of law, including statutory interpretation and application, are reviewed *de novo*. *Adamson v. Adamson*, 635 S.W.3d 72, 77 (Ky. 2021) (citing *Estate of Benton v. Currin*, 615 S.W.3d 34, 36 (Ky. 2021)).

IPO proceedings are governed by statutes in KRS Chapter 456. "Following a hearing ordered under KRS 456.040, if a court finds by a preponderance of the evidence that dating violence and abuse, sexual assault, or stalking has occurred and may again occur, the court may issue an interpersonal protective order[.]" KRS 456.060(1). According to KRS 456.010(8), "'Stalking' refers to conduct prohibited as stalking under KRS 508.140 or 508.150, or a criminal attempt, conspiracy, facilitation, or solicitation to commit the crime of stalking[.]"

Relevantly, KRS 508.150 defines the crime of stalking in the second-degree as including conduct consisting of intentionally stalking another person and making an explicit or implicit threat with intent to put the other person in reasonable fear of sexual contact, physical injury, or death.

KRS 508.130(1) defines stalking for purposes of KRS 508.130 to KRS 508.150 as follows:

> (a) To "stalk" means to engage in an intentional course of conduct:
>
> 1. Directed at a specific person or persons;
>
> 2. Which seriously alarms, annoys, intimidates, or harasses the person or persons; and
>
> 3. Which serves no legitimate purpose.
>
> (b) The course of conduct shall be that which would cause a reasonable person to suffer substantial mental distress.

A "course of conduct" consists of two or more acts "evidencing a continuity of purpose." KRS 508.130(2).

Construing these statutes together, this Court has set forth a petitioner's burden of proof for obtaining an IPO for stalking:

> To summarize, for an individual to be granted an IPO for stalking, he or she must at a minimum prove by a preponderance of the evidence that, an individual intentionally engaged in two or more acts directed at the victim that seriously alarmed, annoyed, intimidated, or harassed the victim, that served no legitimate purpose, and

-14-

would have caused a reasonable person to suffer substantial mental distress, and that these acts may occur again. KRS 508.130 and KRS 456.060. Additionally, the individual must prove that there was an implicit or explicit threat by the perpetrator that put the victim in reasonable fear of sexual contact, physical injury, or death. KRS 508.150.

*Halloway v. Simmons*, 532 S.W.3d 158, 162 (Ky. App. 2017).

"[I]n reviewing the [IPO] decision of a trial court the test is not whether we would have decided it differently, but whether the court's findings were clearly erroneous or that it abused its discretion." *Gomez*, 254 S.W.3d at 842 (citation omitted). We must give due regard to the family court to judge the credibility of the witnesses. CR 52.01.

On appeal, Woodie argues the family court erred in interpreting KRS 508.150 as Hull failed to establish there was an implicit or explicit threat made by him that put her in reasonable fear of sexual contact, physical injury, or death. Woodie acknowledges the acts relied upon by the family court to support its conclusion that Hull had such a fear: (1) Woodie showed up at her workplace and knocked on her window while she was in her car; (2) Woodie sent numerous love letters, gifts, and cards to her that were unwelcome, and the affection was not reciprocal; (3) Woodie called police dispatch to have her vehicle stopped and searched by law enforcement; (4) Woodie authored a "be on the lookout" flyer detailing Hull's drug abuse; (5) Woodie showed up at her places of residence when

he was unwelcome and uninvited, in one instance attempting to remove a vehicle tag and in another to attempt to make contact with her and her parents to resolve their disputes; (6) Woodie parked his vehicle on her street when he had no business there; (7) Woodie called police to report Hull for a parking violation at Walmart; and (8) Woodie performed unrequested home improvement projects at the residence Hull shared with her family and found other reasons to be there in an effort to see her and advance his preoccupation.

Woodie asserts these actions do not satisfy the statutory fear element, and the family court erroneously relied upon *Allen v. Eder* in determining his actions were sufficient to qualify as an "implicit threat."

In *Allen*, a city police chief ("Allen") and his paramour ("Eder") dated, but Eder ended the relationship. 682 S.W.3d at 33. The couple saw each other briefly shortly thereafter, and approximately one month after that meeting, Allen showed up at Eder's daughter's soccer game; he left without speaking to Eder but texted her; she did not reply. *Id.* The next month, Allen sent Eder a card expressing his love for her, and Eder blocked Allen's number. *Id.* at 33-34. Two months later, Eder received text messages from an unknown number, one of which stated,

> "I saw you all sitting in the living room this evening looked nice [*sic*]. I see you seeing a Dave Gooch and he has spent a lot of nights there." Eder responded with "?". Almost immediately thereafter, Eder received another message from that same number saying, "Your house Dave spent the night last Friday." Then another message

was sent saying, "you were sitting on your couch tonight." Eder was concerned about the messages and suspected that Allen had sent them.

*Id.* at 34.

Eder reached out to the Kentucky State Police. *Id.* During a subsequent investigation, investigators discovered the unknown number was associated with Allen's daughter. *Id.* Allen admitted that he saw Eder and a man in a car and asked another police officer to run the license plate. *Id.* After the investigator relayed this information to Eder, "she became very concerned for her safety." *Id.* Eder petitioned for an IPO and, following a hearing, the family court entered an IPO against Allen. *Id.* The court "found that Allen's actions met the definition of stalking under KRS 508.130[,]" and "amounted to an explicit or implicit threat with the intent to place Eder in reasonable fear." *Id.*

On appeal, this Court affirmed the IPO. *Id.* at 33. We determined there was substantial evidence to support each of the elements of stalking, but "[t]he more difficult question [was] whether there was sufficient evidence to prove that Allen made an explicit or implicit threat to put Eder in reasonable fear of sexual contact, physical injury, or death as required by KRS 508.150(1)(b)." *Id.* at 36.

First, this Court agreed with the family court's assessment:

The act of communicating with Eder to inform her that he was actively watching her home and monitoring her activities and demonstrating he had the capability of using

-17-

his authority as a police officer to obtain information as to her associations was an implicit threat that caused Eder to fear for her safety.

*Id.* A majority of this Court found no clear error in those factual findings by the family court, and agreed that while "Eder did not identify any prior words or conduct by Allen that would indicate he may resort to violence[,] . . . [his] stalking actions were deeply disturbing, and he clearly abused his authority as a police officer in order to further his personal interests." *Id.* at 36.

Next, the Court addressed whether Allen's behavior constituted an implicit threat to Eder, as concluded by the family court. Again, a majority of this Court did not find the family court's legal conclusion – that Eder had a legitimate basis to fear that she faced a realistic threat of the escalation of Allen's behavior into unwanted sexual contact – to be unreasonable or arbitrary. *Id.* The family court had noted Allen's persistent surveillance and his willingness to abuse his position. *Id.* This Court stated, "[h]e did not have to brandish a weapon for her to conclude that he posed a clear and ongoing danger to her." *Id.* at 37.

On appeal, Woodie argues *Allen* was wrongly decided, is distinguishable, and relied on a more compelling record, but we do not agree. True, in *Allen* there was a prior dating relationship and a clear, distinctive end to the relationship, but under these circumstances those factors do not negate the precedent's application.

The family court found that, like in *Allen*, Woodie was "blatantly persistent in surveilling [Hull]." The court found he was "constantly" at her home unasked; after being told to stay away, he showed up at midnight demanding her attention and again later to remove the license plate from her vehicle. The court stated Woodie's conduct escalated, invaded her privacy, and believed he would continue to be around Hull "whether she like[d] it or not."

The family court found that, as in *Allen*, the context of the texts themselves were non-threatening, but threats are not always overt:

> Although this Court heard testimony that there were upwards of 1900 pages of text messages between the Parties, the Court specifically received one page of texts . . . that caused specific concern on just how far a text message being "nice" can still be threatening. On August 10, 2024, after [Hull] responded with "I'm good" to [Woodie], [Woodie] sent a total of seventeen (17) messages between 6:30 p.m. to almost 2:00 a.m. with no message back from [Hull]. The content of those messages were indicative of just how persistent [Woodie] is to speak to [Hull], ranging from stating he would get her gifts of food, that he loves her, that he wishes to give the car back to her, that he does not want her to call and ask for money, and that he is not going anywhere unless [Hull] tells him to go away, which he knows she will never do.

The family court also found, like in *Allen*, Woodie coopted the police as a tool of intimidation and harassment. The court noted that Woodie admitted to calling the police on Hull at least once and to making the flyer. The court also believed Hull's testimony that Woodie instigated the police interactions at other

-19-

times. The court held that Woodie used these actions to make Hull do "what he wanted." Woodie argues on appeal that he did not have superior access to local law enforcement through his employment, but that argument misses the pertinent conclusion: regardless of his law enforcement connection or lack thereof, Woodie, like Allen, used the police as a tool to control and/or intimidate his victim.[6]

The *Allen* Court defined implicit as "capable of being understood from something else though unexpressed . . . ; involved in the nature or essence of something though not revealed, expressed, or developed . . . ." 682 S.W.3d at 37 (citation omitted). We take no issue with that definition, nor its application. Like in *Allen*, the family court determined fear could be established through a course of conduct, and clearly understood as a threat, despite not being overt words or expressly combative actions. Here, as in *Allen*, the course of conduct included a realistic threat of the escalation, blatant persistence in surveillance (particularly with respect to another romantic interest), and abuse of law enforcement to assist in creating fear and/or control. We agree, that like in *Allen*, Woodie "did not have to brandish a weapon for her to conclude that he posed a clear and ongoing danger

---

[6] The family court stated that Woodie "had the capacity to direct law enforcement and had close relationships with law enforcement." However, Woodie argues on appeal that he called the general police line and had no special relationship with local law enforcement. As noted, Woodie's employment, professional role, and law enforcement connections are unclear to this Court. While clarity on this point would have been helpful, *how* Woodie contacted police is not dispositive; the fact that Woodie called police is the pertinent fact.

to her." *Id.* Thus, we find no error in the family court's reliance upon and application of *Allen*.

Additionally, Woodie argues that the family court misinterpreted KRS 508.150. Again, we review *de novo* such questions of law as statutory interpretation and application. *Adamson*, 635 S.W.3d at 77 (citation omitted). KRS 508.150, the criminal statute for stalking in the second-degree, requires an explicit or implicit threat with intent to put the other person in reasonable fear of sexual contact, physical injury, or death. Here, Woodie's course of conduct amounted to such an implicit threat.

Woodie bombarded Hull with messages of love to the point of obsession even after she repeatedly told him his feelings were not reciprocated and never would be. Woodie sent unwanted gifts, including a sexual toy, to this woman 20 years his junior. Woodie waited outside her home and followed her. He sat outside her work and outside her boyfriend's home. Despite the fact that Hull had no drug convictions, he pursued court-ordered drug treatment for her. He called police on her numerous times and used law enforcement as a tool to control her. He "leased" her a car then placed a locational tracker on the vehicle. Her parents' requests that he stop speaking about her and to her did not deter him. After she blocked him from all forms of communication, he arrived at her family home near midnight and demanded to see

her. Stepfather told him to leave and to leave Hull alone, yet only days later he returned to remove a license plate from the vehicle Hull was currently driving.

Again, while the testimony of Woodie and Hull conflicted at times, the family court is in the best position to assess the credibility of witnesses and weigh the evidence presented. *See Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003) (citations omitted). In this case, the family court conducted a full evidentiary hearing, fairly afforded each party a chance to present his/her case, and after doing so, chose to believe, at a minimum, (1) Hull on her fear, (2) her parents as to their repeated requests for Woodie to leave Hull alone and his infatuation, and (3) Woodie as to his actions. Importantly, it was *Woodie's own testimony* that established his obsessive behaviors, methods of intimidation, attempts to control Hull, and his sense of entitlement to do all the above. His inability to recognize the harm his course of conduct was creating only exacerbated Hull's fear that he was escalating without relenting. The family court's findings were thorough, concrete, specific, and not clearly erroneous. Furthermore, the family court's legal conclusions were supported, comprehensive, reasonable, and not arbitrary. Hence, we affirm the order of the family court entering an IPO.

## B. CR 60.02 Denial: No Reversible Error

The decision whether to grant or deny a motion filed pursuant to CR 60.02 is wholly within a trial court's discretion. *Age v. Age*, 340 S.W.3d 88, 94

(Ky. App. 2011) (citing *Schott v. Citizens Fidelity Bank & Trust Co.*, 692 S.W.2d 810 (Ky. App. 1985)). Therefore, issues regarding CR 60.02 motions are reviewed under an abuse of discretion standard. *Id.* (citing *Richardson v. Brunner*, 327 S.W.2d 572, 574 (Ky. 1959)). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (citations omitted). Additionally, "[r]elief pursuant to CR 60.02 is an extraordinary remedy which should be cautiously granted." *Copas v. Copas*, 359 S.W.3d 471, 476 (Ky. App. 2012) (citations omitted).

In his CR 60.02 motion, Woodie argued extraordinary relief was appropriate due to (1) newly discovered evidence and/or (2) proof Hull, Stepfather, and Mother perjured themselves, thereby negating their credibility.

Relevant to CR 60.02(b), newly discovered evidence, Woodie introduced an investigation by the Park Hills Police Department into Woodie's conduct. In part, Woodie argued the

> Park Hills Police Department conducted an investigation into whether [Woodie] was stalking [Hull]. Their investigation included interviews with [Hull] and her attorney and was based on the same evidence and events that was heard by the [family court] at the [November Hearing]. Park Hills Police consulted with the Kenton County Attorney's Office who reviewed the extensive investigation that had been conducted and declined to prosecute, stating that it did not meet the statutory requirements of Stalking in the Second Degree. These are

-23-

the same statutory requirements that constitute stalking for purposes of an IPO.[7]  See exhibit G.

Exhibit G was the Park Hills Police report.  This report was largely a narrative from the investigator that included an abbreviated synopsis of the evidence given at the November Hearing.  *Interestingly*, the investigator quoted undated messages from Woodie to Hull that stated, "I will do everything in my power to prevent int [*sic*], even if I have to do thing [*sic*] that will make you never speak to me again[,]" and "Do you really want to be a crack whore?"  Additionally, the investigator stated that Woodie "admitted he had caused police reports against [Hull's boyfriend] and [Hull]."  Also, Woodie admitted to the investigator that "he had placed a tracking device on the vehicle he 'leased' to [Hull.]"  The investigator labeled Woodie's behavior "grossly disturbing," "at times beyond obsessive," "very disturbing," and "exploitative."

Relevant to CR 60.02(c), perjury or falsified evidence, Woodie produced evidence that allegedly established Hull and her witnesses perjured themselves at the November Hearing, thereby negating their overall credibility. For instance, Woodie argued Hull lied about who drove her home from the jail after an arrest, and that she told police during a stop that the car she was driving

---

[7] We note the varied burden for criminal stalking (beyond a reasonable doubt) and the IPO statutory requirements (preponderance of the evidence). *Miller v. Commonwealth*, 77 S.W.3d 566, 576 (Ky. 2002); KRS 456.060(1).

belonged to her deceased grandmother when in actuality it belonged to her living great-aunt. Woodie asserted Stepfather lied on a legal form in order to get his firearms rights restored, and Mother lied about a car being reported as stolen when there is no record of the car having been reported stolen. Woodie argued other examples of perjury as well, but none of his arguments alleged the family court made any factual error relating to *Woodie's* conduct.

In July 2025, the family court denied Woodie's CR 60.02 motion. Recognizing the high burden required for a successful CR 60.02 motion, the court determined that the new evidence, including the police investigation, was not "of such significance that they would have, with reasonable certainty, changed the result of this Court issuing an IPO." In fact, the family court stated Exhibit G supported the court's conclusions:

> The [family court] previously found that [Woodie's] use of police interference was a tool to intimidate and harass [Hull] in a clear implicit threat. From Exhibit G, [Woodie] did in fact frequently utilize police interference, especially in the lead-up of the filing of the petition. Thus, the police investigation and its conclusions are not of such significance that they would have, with reasonable certainty, changed the result of this Court issuing an IPO. If anything, the police investigation and its conclusions reinforces the [family court's] Findings and supports the conclusion that an IPO was warranted.

Similarly, the family court was not swayed by the arguments of perjury or falsified evidence. Again, the court did not believe the evidence would

have made a different result had the truth been known because, in part, it was Woodie's testimony that established his stalking, not the other three witnesses accused of perjury. The court stated:

> The [family court] noted in its [December Order] that [Woodie] focused his testimony on attacking the credibility of [Hull]. Ultimately to the [family court], both then and now, the [c]ourt focused on the actions of [Woodie] and based its Findings on his actions. Nothing presented in [Woodie's] Motion establishes that any testimony regarding [Woodie's] action were false. Thus, the [c]ourt finds no basis to conclude, given this Motion, that its ultimate decision would have changed.

Therefore, the family court denied Woodie's CR 60.02 motion.

On appeal, Woodie also argues the family court ignored the new evidence implying the case was civil, not criminal, and improperly weighed the credibility of the witnesses. Woodie points to the statements within the police report that indicate Woodie utilized the publicly available police report line (not law enforcement contacts) to instigate Hull's vehicle searches. However, as the family court found, it was Woodie's use of law enforcement as a tool to intimidate and control Hull that was dispositive.

Similarly, Woodie's "proof" that Hull, Stepfather, and Mother perjured themselves on non-dispositive issues does not negate the family court's ability to judge the credibility of the witnesses on other, more relevant, issues. Also, these allegations of perjury do not negate Woodie's actions, actions established by *his*

-26-

testimony, text messages, cards, and a police report he later submitted for the court's review (Exhibit G).  Contrary to Woodie's argument, the Exhibit G police report *supported* the family court's findings and conclusions.  Also, the alleged perjured statements do not disprove the dispositive factors relied on by the family court in determining the necessity for a protective order.  As such, we find no abuse of discretion in the family court's denial of Woodie's CR 60.02 motion.

## CONCLUSION

Accordingly, we AFFIRM the Kenton Family Court.


ALL CONCUR.


BRIEFS FOR APPELLANT:

Jeffrey A. Lawson
Covington, Kentucky

BRIEF FOR APPELLEE:

Darrell A. Cox
Covington, Kentucky